IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI, JACKSON DIVISION
_____

**MORGAN KEEGAN & COMPANY, INC.**

    **Plaintiff**,

vs.                                                   Case No. 3:11-cv-638-DPJ-FKB

**YGONDINE W. STURDIVANT and
MIKE P. STURDIVANT,**

    **Defendants.**
_____

**MORGAN KEEGAN'S OPPOSITION TO DEFENDANTS' COUNTER-PETITION TO VACATE ARBITRATION AWARD AND REPLY MEMORANDUM IN SUPPORT OF MORGAN KEEGAN'S PETITION TO CONFIRM FINRA ARBITRATION AWARD**
_____

Plaintiff, Morgan Keegan & Company, Inc. ("Morgan Keegan" or "Plaintiff"), respectfully submits this Memorandum in Opposition to Defendants' Counter-Petition to Vacate the Arbitration Award and in further support of Morgan Keegan's Petition to Confirm FINRA Arbitration Award.[1]

### I.  INTRODUCTION

In the underlying arbitration, the arbitration Panel, after a five-day hearing, unanimously determined that Defendants, Mike Sturdivant and Ygondine Sturdivant ("the Sturdivants" or "Defendants"), were not entitled to any monetary damages for their losses in investments in the high-yield RMK Funds. The Panel then entered an arbitration award ("Award") denying all of Defendants' claims. Morgan Keegan moved to confirm the Award; Defendants seek to vacate the Award.

Section 9 of the Federal Arbitration Act ("FAA") specifies that on application, a court "must" confirm an arbitration award "unless the award is vacated, modified or corrected". 9 U.S.C. § 9.

---

[1] Pursuant to L.U.Civ.R. 7, the moving and reply brief may not exceed 35 pages. In this context, Morgan Keegan is submitting a combined Response to Defendants' Counter-Petition as well as a Reply in support of confirmation. To the extent, in this unusual situation, the 35-page rule is applicable, Morgan Keegan requests leave of the Court to exceed that limit by one to two pages. This is necessary as Defendants set forth a few arguments in their brief that Morgan Keegan had yet not addressed in its principal brief.

Defendants have failed to provide *any* legitimate reason why this Court, reviewing the arbitration proceeding under one of the narrowest standards in all of American jurisprudence, should vacate the unanimous decision of the three-member Panel. Therefore, the Award must be confirmed.

In an attempt to support vacatur, Defendants first contend that one member of the Panel failed to prepare for a telephonic evidentiary hearing that occurred prior to the arbitration hearing. Defendants proffer no evidence to support their conclusory allegation that the arbitrator failed to prepare for this pre-hearing telephonic conference call. Moreover, this allegation is belied by, among other evidence, the Panel's Order following the pre-hearing conference call that explicitly states that the arbitrators reviewed all the materials and briefs the parties submitted to the arbitrators before rendering an evidentiary decision.

Second, Defendants erroneously argue that Arbitrator David Dresnick ("Arbitrator Dresnick") failed to disclose information concerning his background. Defendants are wrong. In fact, Arbitrator Dresnick disclosed the very information Defendants complain was not disclosed.

Third, Defendants contend that Arbitrator Dresnick commented off the record during the hearing that the arbitration was about nothing more than the market. Defendants again make this allegation without any proof. Even if such a comment were made, this arbitration very much concerned the market, the Credit Crisis in 2007 and 2008, and the Credit Crisis' effect on the RMK Funds, so this would have been an unremarkable comment, not evidencing any bias.

Fourth, Defendants argue that the Panel's Chairman, Arbitrator Marc Kalish ("Arbitrator Kalish"), who, notably, prior to the *Sturdivant* arbitration twice ruled *against* Morgan Keegan in RMK Funds cases and in favor of investors,[2] evidenced bias through his questioning of Defendants' expert, Dr. Craig McCann ("McCann"). Arbitrator Kalish's questioning of McCann is allowed in a

---

[2] Prior to the *Sturdivant* case, Arbitrator Kalish served as the only Panelist in the matters of *Henson v. Morgan Keegan*, FINRA Case No. 10-03198; and *Tallman v. Morgan Keegan*, FINR Case No. 10-04456, and awarded investors damages in both cases which involved the RMK Funds. (*See* Affidvait of William Whitman ("Whitman Aff.") at **Ex. 1**.)

FINRA arbitration; moreover, Arbitrator Kalish's benign and limited questions of McCann constituted nothing more than an attempt to better understand McCann's expert opinion.

Finally, Defendants contend the Panel erred in excluding unadjudicated regulatory complaints and inadmissible settlements from evidence. The Panel made the right evidentiary decision, applying numerous evidentiary rules. More importantly, however, under established law limiting the scope of a court's review of an arbitration award this evidentiary decision is clearly the Panel's decision to make and cannot form a basis to vacate an Award.

There is absolutely no basis to vacate the decision of the Panel. Therefore, respectfully, this Court, pursuant to the FAA, must confirm the Award in favor of Morgan Keegan. In addition, pursuant to the parties' contract and the applicable law, Morgan Keegan should be awarded its costs and attorney fees in this action.

## II.   ARGUMENT

### A.   The Arbitrators Were Prepared and Reviewed the Written Materials.

Contrary to Defendants' bald allegations in their Counter-Petition and Memorandum, the arbitrators were very prepared for the pre-hearing conference and for the hearing. Without any proof whatsoever, Defendants allege that Arbitrator Dresnick was not prepared for a pre-hearing conference. Defendants' conclusory allegations, without any support in the record or any credible evidence, cannot form the basis of a vacatur action. *See Wanken v. Wanken*, 451 Fed. Appx. 319, 322 (5th Cir. 2011) (denying vacatur when the movant only relies on his own conclusory allegations, and fails to provide any credible evidence to support his allegations and fails to cite anything in the record to support his contention); *see also Greater Canton Ford Mercury, Inc. v. Ables*, 948 So.2d 417, 423 (Miss. 2007) ("This Court is limited to consideration of the facts in the record, while reliance on facts only disclosed in the briefs is prohibited"); *TIG Ins. Co. v. Sedgwick James of Wash.,* 276 F.3d 754, 759 (5th Cir. 2002) (conclusory allegations, speculation, unsubstantiated

3

assertions, and legalistic arguments have never constituted an adequate substitute for establishing specific facts). Even if the Court considers counsel's conclusory statements in a memorandum as "evidence" of an arbitrator's unpreparedness, the statements are belied by the actual evidence.

First, FINRA sent the arbitrators the parties' briefs concerning pre-hearing motions via FedEx on September 20 so that they would have the papers in time to review for the September 21 hearing at 2:00 p.m. (*See* Whitman Aff. at **Ex. 2**.) The parties both submitted two briefs in support of their position (in fact, Defendants were allowed to submit a sur-reply brief, which is not even contemplated by the FINRA Rules.) Accordingly, absent unusual circumstances, the arbitrators would have had all the briefs and memoranda in their possession for the pre-hearing conference call.[3]

Second, a fundamental legal principle is that "[c]ourts speak through their order." *Schlueter v. Southern Energy Homes, Inc.*, 252 Fed.Appx. 7 (6th Cir. 2007). Here, the Panel's Order affirmatively states that the Panel's decision was made *after a review of all of the pleadings*. (*See* Doc. 19, Moses Aff. at **Ex. 7**.) Notably, as well, FINRA sends arbitrators a form proposed Order. (*See* Whitman Aff. at **Ex. 3**.) The form Order does not state that the Panel has reviewed all the pleadings. Here, the arbitrators did not use the form Order, but instead crafted their own well-reasoned, two-page Order, explicitly stating that they had reviewed the materials. The Panel, speaking through an Order it prepared, fundamentally discredits Defendants' argument that the Panel (and Arbitrator Dresnick) was not prepared and did not review the parties' written submissions prior to ruling on evidentiary issues.

Third, in addition to documentary evidence, the Panel conducted a lengthy pre-hearing conference, during which the parties both spent significant time explaining their position. The Panel

---

[3] Counsel for Morgan Keegan who participated in this pre-hearing call do not recall Mr. Dresnick stating he did not have the briefs during the pre-hearing conference. The undersigned attempted to obtain tapes of the pre-hearing conference but FINRA advised, consistent with its general practice, that it did not tape this particular pre-hearing conference call.

was well-versed on the issues at the end of the oral argument, and then went into executive session before rendering its decision.

Finally, this issue lacks any merit because Defendants failed to timely preserve any objection to the Panel's evidentiary ruling. Rather than objecting at the time of the pre-hearing conference to the conference going forward before all of the panelists had the parties' papers (if, in fact, that was the case), or rather than putting their objection to the process about which they now complain on the record at the start of (or at any time during) the hearing, and rather than filing a complaint to FINRA regarding Arbitrator Dresnick's alleged unpreparedness, Defendants' counsel did the exact opposite. As highlighted in Morgan Keegan's initial memorandum in support of confirmation, Defendants' counsel accepted the Panel even after the pre-hearing conference about which they now complain. (*See* Morgan Keegan's Memorandum in Support of Petition to Confirm at p. 8-9.)   Notably, Mr. Ledbetter made no mention of Mr. Dresnick's alleged unpreparedness. At the end of the hearing, Defendants' counsel heaped additional praise on the Panel.[4]  Counsel's statements made on the record at the hearing utterly belie Defendants' post-Award claims that the Panel was unprepared. Accordingly, Defendants have waived any such argument regarding Arbitrator Dresnick's preparedness. "'[I]t is well settled that a party may not sit idle through an arbitration procedure and then collaterally attack the procedure on grounds not raised before the arbitrators when the result turns out to be adverse.'"  *Brook v. Peak Int'l, Ltd*, 294 F.3d 668, 674 (5th Cir. 2002)  (quoting *Marino v. Writers Guild of America, East, Inc.*, 992 F.2d 1480, 1484 (9th Cir. 1993)).   Here, Defendants sat idle and never raised this issue, and now cannot seek vacatur on these grounds.

**B.**     **Arbitrator Dresnick Made Proper Disclosures.**

In conformity with the FINRA Code of Arbitration Rules, FINRA follows a process in selecting the arbitration panel to hear a case. As part of that process, the parties to the arbitration are

---

[4] Mr. Ledbetter stated at the end of his closing argument:  "**And with that, I -- I just cannot, again, praise highly enough the work of this panel, *the decisions you've made*, the way you have controlled both sides of the table.**"   (Moses Aff., at **Ex. 2**, Volume 5 at p. 1367: 3-6.) (emphasis added.)

5

both afforded an opportunity to review a list of potential arbitrators and either rank them or strike them.  (*See* FINRA Rules 12400-12406.)[5]  To assist the parties, FINRA provides the parties with the potential arbitrators' biographical and other information, as well as any important disclosures or potential conflicts of the arbitrators.  Then, after each party is provided this information and after each party submits a ranked list of arbitrators, FINRA selects the panelists based on the parties' respective rankings.  In this case, the parties were provided information and disclosures regarding Arbitrator Dresnick along with the other potential arbitrators.   (*See* Whitman Aff. at **Ex. 4**).

Defendants now claim that Arbitrator Dresnick failed to make a number of disclosures, including that he was president of a development company, three banking firms, and a New York Stock Exchange Subsidiary that placed $1 billion per year in real estate debt or that he was a Senior Executive and Chief Lending Officer for several large insured depository companies that is made on his website biography. (Defendants' Memorandum at 9.)   Defendants claim that had these facts been disclosed they would have stricken Arbitrator Dresnick.

In fact, Arbitrator Dresnick made practically identical disclosures on his arbitrator disclosure form that FINRA provided to the parties.  Below, in part, is what was disclosed to both Morgan Keegan and Defendants about Arbitrator Dresnick prior to the parties choosing to rank or to strike Arbitrator Dresnick:

> **ARBITRATOR BACKGROUND INFORMATION**
>
> Mr. Dresnick has had over 25 years of experience as the President of a development company, three mortgage banking firms, a New York Stock Exchange subsidiary that placed $1 billion per year, in real estate debt. Executive Vice President of a privately owned real estate syndication company, President of an FDIC insured institution and the Senior Executive and Chief Lending/Credit Officer for several large insured depository companies.

(*Id*.)

In other words, Dresnick made the exact disclosures Defendants claim he should have, and did not make.

---

[5] The full text of the FINRA Code of Arbitration Procedure for Customer Disputes is available at http://www.finra.org/arbitrationandmediation/arbitration/rules/codeofarbitrationprocedure/.

Moreover, Arbitrator Dresnick's experience does not, nor should it, disqualify Arbitrator Dresnick from serving on a FINRA arbitration Panel.  As the Fifth Circuit astutely observed in *Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 476 F.3d 278, 281 (5th Cir. 2007), "one of [arbitrations'] most attractive features apart from speed and finality" is the "**expertise**" of the arbitrators.[6]  Other courts concur, and have, as well, declined to vacate awards based on an arbitrator's reliance on his experience.  *See, e.g.*, *The Guldborg*, 1 F. Supp. 380, 381 (S.D.N.Y. 1932) ("[I]t is not an impropriety for an arbitrator to draw upon his general experience in deciding the dispute before him.  In submitting a dispute to arbitration, the parties must have had it in mind that the expertness of the arbitrators would contribute an element of value toward a just and fair solution of the particular dispute."); s*ee also M & A Elec. Power Co-op v. Local Union No. 702 Int'l Bhd. of Elec. Workers*, 773 F. Supp. 1259, 1262 n.2 (E.D. Mo. 1991) ("One of the chief merits claimed for arbitration as a method of settling controversies is the opportunity of having the matter decided by experts in the particular field").  Thus, the fact that Arbitrator Dresnick likely had some basic understanding of the types of securities in which the RMK Funds invested does not even begin to meet such an onerous threshold of establishing bias as is required for vacatur.  Rather, it simply makes him more knowledgeable about this dispute.

C.     **Arbitrator Kalish's Questioning of McCann Was Proper.**

Although the hearing lasted five days, Defendants point to *one* question that Arbitrator Kalish asked of one witness *without objection* as somehow supporting their claim that Arbitrator Kalish was biased.

---

[6] Defendants state in a footnote that Tennessee law applies to this proceeding due to a contractual choice of law provision and then principally cite to the TUAA, FAA and Sixth Circuit cases without any analysis.  As Morgan Keegan cited in its initial Memorandum, the Fifth Circuit has held that the FAA's vacatur standard applies when the parties, like in this situation, "do not evince a clear intent to opt out of the FAA default rules." *Action Indus., Inc. v. U.S. Fid. & Guar. Co.*, 358 F.3d 337, 341 (5th Cir. 2004) (citation omitted).  A logical corollary principle that the Fifth Circuit has also embraced is that "[t]he Federal Arbitration Act ('FAA') and interpretative cases from **this Circuit** provide the rules of decision on when to vacate an award." *Sarofim v. Trust Co. Of The W.*, 440 F.3d 213, 220 n.10 (5th Cir. 2006) (emphasis added).  Although the law in both Tennessee and the Sixth Circuit is often similar, if not identical, to the Fifth Circuit in this area, this Court should first look to the law of the Fifth Circuit and treat it as mandatory in determining this dispute.

For myriad reasons, Arbitrator's Kalish's question unquestionably does not serve a basis to vacate an arbitration award. First, Defendants did not timely object to the question about which they now complain. With regard to evidentiary objections, "[f]ailure to object at trial acts as a procedural bar in an appeal." *Jackson v. State*, 832 So.2d 579 (Miss. App. 2002) (citing *Carr v. State*, 655 So.2d 824, 853 (Miss. 1995)). Defendants have waived the right to even challenge the question they now claim was impermissible.

Second, judges and arbitrators are allowed to ask questions of witnesses. A court "may interrogate witnesses, whether called by itself or by a party." Fed. R. Evid. 614. As the Fifth Circuit has held, "[a] judge may comment on evidence, question witnesses, elicit facts not yet adduced, or clarify those previously presented." *Sims v. ANR Freight System, Inc.*, 77 F.3d 846, 849 (5th Cir. 1996). And the reasons why a judge may ask questions are numerous: "the presiding judge may ask witnesses questions for the purpose of elucidating a point; clarifying evidence already given; testing the accuracy of the testimony given by a witness; preventing perjury; developing trustworthy testimony; eliciting material evidence which has not been brought out or was left obscure; giving a witness an opportunity for explanation; or examining a witness caught in a contradiction." C.J.S. Witn. § 424.

The same holds true in arbitrations. FINRA Rules provide that arbitrators "will decide what evidence to admit" (FINRA Rule 12604), and arbitrators are afforded wide discretion when it comes to evidentiary issues. Additionally, there is no bar in the FINRA Rules to arbitrators questioning witnesses. FINRA's Dispute Resolution Guidebook to Arbitrators, in fact, instructs arbitrators that "[e]ach arbitrator has a right to question witnesses." (Whitman Aff. at **Ex. 5**.)

In addition, courts have long held that arbitrators may ask questions of witnesses. *See Butler v. Boyles*, 29 Tenn. 155, 155 (Tenn. 1849) ("A judge may very properly ask questions of witnesses, and especially may an arbitrator do so, as the tribunal is less dignified, less formal, and usually unassisted by council [sic]. That the arbitrator was requested to question the witness is no proof of

8

partiality"); *Sisti v. Merrill Lynch, Pierce, Fenner & Smith*, No. 91-00102-R, 1991 U.S. Dist. LEXIS 15817, at *9 (E.D. Va. Apr. 22, 1991) ("An arbitration panel is obligated to determine the facts at issue, and directly asking a witness questions is a method of seeking those facts. Although interrupting a witness during his examination to ask those questions may be distracting and somewhat disturbing, without more, it does not display bias on the part of the arbitrators."). That those questions may be pointed or perceived as hostile provides no basis for vacatur. *Carpenter v. Brooks*, 534 S.E.2d 641, 646 (N.C. Ct. App. 2000) ("[A]n arbitrator is permitted to ask questions of witnesses, as is a judge at trial. Such questioning, which seeks to clarify testimony, is proper even if the questions are perceived as hostile so long as the examination does not prejudice either party").

The minimal and innocuous question posed by Arbitrator Kalish to Defendants' expert, McCann, during the arbitration did not cause prejudice and cannot serve as the basis for vacatur of the Award. Defendants did not cite the entire colloquy between Arbitrator Kalish and McCann, which shows that McCann was merely provided an opportunity to clarify his testimony. The entire "objectionable" colloquy between Arbitrator Kalish and McCann is as follows:

```
 5  CHAIRMAN KALISH: Isn't the point of
 6  your -- your testimony then, these were not wise
 7  investments as opposed to -- but what we have to
 8  figure out is what was disclosed, what was disclosed
 9  adequate to inform the Sturdivants as they existed
10  at that time --
11  A. Right.
12  CHAIRMAN KALISH: -- regarding the
13  investments they were making? Not whether --
14  because if these were -- if we knew back in 2005
15  that these were as bad as you're saying they were,
16  one would hope that somebody would step in and say,
17  "You can't sell these anymore."
18  But nobody did that. These are all
19  looking at it saying, "Now that we know what we
20  know, nobody should have invested in these things."
        A. Not at all. I don't think I mean to be
22  disagreeable at all. But if you look at the slide
23  directly above the one you're looking at right now,
24  the slide 40, I've got two quotes from 005 there.
25  One from Alan Greenspan that talks about how the,
if
```

**Page 163**
```
 1  I may, "The risk per dollar notion on that of the
 2  first loss or equity tranche can be 30 or 40 times
 3  the risk per dollar of the senior tranche."
 4  So that -- that -- that the preference
 5  share in this Webster CDO is 30 or 40 times as risky
 6  as the senior tranche was known in 2005 and has
 7  no --
 8  CHAIRMAN KALISH: I understand. That goes
 9  to the adequacy of disclosures as opposed to whether
10  or not Mr. Kelsoe made good or bad investment
11  decisions in buying these things.
12  A. Well, absolutely. I am not, and nothing I
13  said today or will say is questioning a portfolio
14  management decision. I'm not testifying about
15  portfolio management issues.
16  I'm saying this is what is in the fund.
17  You'll look at the documents and determine
whether
18  that were -- those risks were disclosed, but this is
19  clearly the risk in the funds known in 2005.
```

(Whitman Aff. at **Ex. 6**.)

Arbitrator Kalish's questions were merely an attempt to allow McCann to clarify his previous testimony and put it into the context of one of the issues to be decided by the Panel. Although McCann initially disagrees with the question that Arbitrator Kalish asks, he is able to clarify his point to Arbitrator Kalish, which is entirely the purpose of such questions and answers. Moreover, McCann ultimately agrees with Arbitrator Kalish during this exchange. Had Defendants' counsel thought the issue needed further clarification, Defendants had the right to elicit additional testimony from McCann on the very issue that Arbitrator Kalish raised. They cannot now claim foul. The Sturdivants have not and cannot meet their onerous burden of proving that Arbitrator Kalish was biased based on this limited interaction with McCann.

D.  **The Arbitrators Correctly Declined Introduction of Regulatory Materials Into Evidence and the Court May Not Review Such Evidentiary Decisions.**

As set forth in detail in Morgan Keegan's initial Memorandum in Support of Confirmation, the Panel correctly excluded the introduction of regulatory allegations and settlements. In both its Memorandum in Support of Confirmation and in the briefs submitted to the Panel (*see* Doc. 19, Moses Aff. at **Ex. 6**), Morgan Keegan identified myriad reasons why the regulatory materials should be excluded, which included:

- The regulatory allegations and complaint are irrelevant;
- The regulatory allegations and complaint are cumulative of other evidence offered;
- The probative value of the evidence is substantially outweighed by the prejudice;
- Settlement agreements are typically excluded from evidence pursuant to rules of evidence and public policy concerns, particularly when, as here, *Morgan Keegan specifically did not admit any of the regulatory allegations*; and
- Allegations in regulatory complaints are hearsay.

For all of these reasons, the Panel properly excluded the regulatory material from evidence.

Importantly, as set forth in detail in Morgan Keegan's initial Memorandum, in the Fifth Circuit, "'arbitrators have broad discretion to make evidentiary decisions.'" *Parker v. JC Penney Corp.*, 426 Fed. Appx. 285, 289 (5th Cir. 2011) (quoting *Int'l Chem. Workers Union, Local 683C v. Columbian Chems. Co.*, 331 F.3d 491, 497 (5th Cir. 2003)). In fact, Fifth Circuit courts "typically

do[] not review the adequacy of an arbitrator's evidentiary rulings." *Id.* (citing *Amalgamated Meat Cutters & Butcher Workmen v. Neuhoff Bros.*, 481 F.2d 817, 820 (5th Cir. 1973) (explaining that "the arbitrator has great flexibility and the courts should not review the legal adequacy of his evidentiary rulings"))[7]. Here, as set forth above, the Panel made the correct evidentiary decision. Regardless, such evidentiary decisions, even if incorrect pursuant to a strict adherence to the federal rules that are not in effect in arbitrations, do not serve as a basis for vacatur.

E. **Arbitrators' Statement in Award Is Not Evidence of Bias.**

Claimants, again without any explanation and without any evidence, argue that statements in the Award establish evident partiality on the part of the Panel. In rendering the Award, the Panel stated:

> The direct and circumstantial evidence of how Claimants M. Sturdivant and Y. Sturdivant made their investment decisions, as well as the fact that most of the wrongdoing asserted by Claimants M. Sturdivant and Y. Sturdivant was attributable to non-parties, convinced the Panel that any wrongful conduct on the part of Respondent was neither a direct nor proximate cause of Claimants M. Sturdivant and Y. Sturdivants' losses.

(*See* Doc. 19, Moses Aff. at **Ex. 3.**) The Defendants make absolutely no effort and present absolutely no evidence to show how this statement in any way is powerfully suggestive of bias or evident partiality. As set forth above, Defendants' conclusory allegations, without any support in the record or any credible evidence, cannot form the basis of a vacatur action. *Wanken* at 322. Moreover, Defendants, in citing this part of the Award, in essence are complaining about the merits. The Fifth Circuit has stated that it "has no authority to review the merits of the award; our inquiry is limited to determining whether any of the statutory conditions for vacating it have been met." *Id*. at 321.

---

[7] These decisions are consistent with FINRA Rules that provide that the Arbitrators have discretion with regard to what evidence may be introduced. (*See* FINRA Rule 12604 ("The panel will decide what evidence to admit. The panel is not required to follow state or federal rules of evidence")).

11

Nevertheless, the direct and circumstantial evidence presented at the hearing clearly supported the Award and established that Defendants were sophisticated investors who were well aware that the RMK Funds had greater risk than lower-yielding investments and who, as well, did not always rely on their investment advisers. Among the substantial evidence establishing these points was the following:

- The Sturdivants' net worth exceeded $100 million; (Whitman Aff. at **Ex. 7**);
- The Sturdivants had an investment team that was consulted in making investment decisions. That investment team included Harvard-educated and multi-millionaire businessmen Earle Jones and Gaines Sturdivant (Defendants' son); a CPA, Mike Hart; and a Vanderbilt-educated tax attorney with an LLM from New York University, Walker Sturdivant (Defendants' son). (*Id*. at Vol. 4, p. 896);
- In addition to their investments at Morgan Keegan overseen by the investment team, the Sturdivants had significant investments in risky hedge funds, totaling some $25-$35 million away from Morgan Keegan, again evidencing that the Sturdivants were not risk-free investors; (*Id*. at Gerber 001555-1559)
- When investing in those risky hedge funds, Mr. Mike Sturdivant acknowledged under oath that he was a knowledgeable and experienced investor; (*Id*. at GT000021)
- The proof established that even though he had access to a registered investment advisory firm, Mr. Mike Sturdivant and his investment team still made their own investment decisions. In fact, Gerber/Taylor was concerned about the risky decisions the Sturdivant investment team were making in their portfolio, including concentrating a large amount of their investments in a single hedge fund manager. (*Id*. at Sturdivant-011685-86)

The Panel's statement in the Award, then, in no way evidences bias, but, rather, represents a rational conclusion from the evidence presented about who the Sturdivants were and how the Sturdivants made their investment decisions. Regardless, it is not this Court's province to second guess the Panel's Award.

F.      **Morgan Keegan Is Entitled to Its Attorney Fees and Costs.**

Defendants' vacatur motion is utterly without merit. Defendants' false accusations towards Arbitrator Dresnick and their other trumped-up arguments are completely baseless. As requested by Morgan Keegan in its Answer to the Cross-Petition to Vacate, Morgan Keegan seeks, and is entitled to, its attorney fees for defending this vacatur action. Both the parties' contract and applicable law support Morgan Keegan's request.

The parties' contract states as follows: "Any expense, including attorney's fees (whether for outside or inside counsel), incurred by Morgan Keegan in defense of an action brought by the undersigned against Morgan Keegan or its agents or employees in connection with any account of the undersigned shall be borne solely by the undersigned should Morgan Keegan prevail." (Doc. 19, Moses Aff. at **Ex. 4**, ¶22 of the Morgan Keegan Client Agreement, Cash Accounts Only.) Courts have consistently held that such contractual clauses support the awarding of court costs and reasonable attorneys' fees to the successful party both for the arbitration itself and the confirmation proceeding. *See Sailfrog Software, Inc. v. Theonramp Group, Inc.*, 1998 WL 30100 (N.D. Cal. 1998) (relying upon a similar contract provision to award fees related to a confirmation petition and citing *Elite, Inc. v. Texaco Panama Inc.*, 777 F.Supp. 289, 292 (S.D.N.Y.1991) ("The language of [such a clause] clearly supports [the claim] that attorneys' fees and costs are recoverable with respect to any action arising under that agreement"); *Sylvester v Abdalla*, 903 P.2d 410 (Or. Ct. App. 1995); *Kaltenbacher v. Morgan Keegan & Co., Inc.*, 2012 WL 967838 (Fla. Dist. Ct. App. March 23, 2012) (granting Morgan Keegan its attorney fees based upon similar contractual language when defending a similar motion to vacate).

Moreover, even without such express contractual provisions for fees, appellate courts have held that trial courts have the authority to award attorney fees when a party moves to confirm an award. *See, e.g., Wachtel v. Shoney's, Inc.*, 830 S.W.2d 905, 909-10 (Tenn. App. 1991) (holding that Tenn. Code Ann. § 29-5-315 authorizes a trial court to award attorney fees for the effort counsel expended in obtaining an order confirming an award of arbitration); *Machu Pichu Ltd. v. Massan Shipping Industries, Inc.*, 1998 WL 26197 (E.D. La. 1998) (award of fees granted where loser in arbitration had no basis to challenge confirmation of an award).

Pursuant to the plain and unambiguous terms of the parties' contract and pursuant to the baseless nature of Defendants' vacatur petition, Morgan Keegan is entitled to its costs and attorney fees in seeking to confirm the Award and in defending against the attempt to vacate the Award.

### III.  CONCLUSION

Defendants failed to establish evident partiality on the part of the arbitration panel. There simply is no basis to vacate the decision of the Panel. Morgan Keegan respectfully requests that the Court confirm the Award, deny the Petition to Vacate, and award Morgan Keegan its costs and attorney fees.

Respectfully submitted,

/s/ John T. Moses

John T. Moses (MS Bar No. 101126)
BASS, BERRY & SIMS, PLC
100 Peabody Place, Suite 900
Memphis, Tennessee  38103
Telephone:  (901) 543-5900
Facsimile:  (901) 543-5999
jmoses@bassberry.com
*Attorney for Plaintiff*

### CERTIFICATE OF SERVICE

I certify that on June 18, 2012 the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ John T. Moses

10890655.1